## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 3:00CR263 (JCH)** |
| | : | |
| **v.** | : | |
| | : | |
| **DAVID L. BURDEN** | : | |
| **a/k/a Q a/k/a QB a/k/a Quinten** | : | **AUGUST 4, 2005** |

### DEFENDANT DAVID "QB" BURDEN'S
### MEMORANDUM IN SUPPORT OF *CROSBY* RESENTENCING

Defendant David "QB" Burden submits this memorandum in response to the Court's Order dated June 21, 2005, requesting written submissions from the parties on the issue of whether the Court would have imposed a non-trivially different sentence in this case if the United States Sentencing Guidelines had been advisory, and not mandatory.

In 2003, Mr. Burden, who was just a teenager at the time he engaged in the conduct that led to his conviction, was sentenced to a total effective sentence of 210 months' imprisonment and eight years of supervised release based on his convictions for RICO, VCAR, and narcotics conspiracy. The Court imposed this sentence after departing one-level based on a finding that his criminal history category (CHC III) substantially over-represented the seriousness of his criminal history and/or the likelihood that Mr. Burden would commit other crimes. See U.S.S.G. §4A1.3 (2003). For the reasons set forth below, Mr. Burden submits that the sentencing record and the facts of his case suggest that the Court might have imposed a sentence lower than 210 months had the Guidelines not been mandatory and had the Court been permitted to rely equally on all of the sentencing factors set forth in 18 U.S.C. §3553(a).

Accordingly, in the interests of justice, Mr. Burden requests that the Court schedule his case for resentencing.

## NATURE OF THE PROCEEDINGS

On February 11, 2003, after four weeks of evidence and four days of deliberation, David "QB" Burden was convicted by a Bridgeport jury of RICO (Count One), RICO conspiracy (Count Two), VCAR conspiracy to murder (Count Nine), VCAR attempted murder (Count Ten), and narcotics conspiracy (Count Twelve).  He was acquitted, along with two of his co-defendants, of one count of VCAR attempted murder (Count Eleven).

On April 25, 2003, the U.S. Probation Office issued its second disclosure of the Presentence Report ("PSR").  The PSR calculated Mr. Burden's sentence as follows:

**GROUP ONE: RICO Conspiracy and Drug Conspiracy:**

| | |
|---|---|
| Drug Quantity (1.5 kilograms or more of cocaine base) | 38 |
| Use of firearm in connection with the offense of conviction | +2 |
| Adjustment for role in the offense | 0 |
| Victim related adjustment: None | 0 |
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level: | <u>40</u> |

**GROUP TWO: VCAR Attempted Murder, VCAR Conspiracy to Murder:**

| | |
|---|---|
| VCAR Attempted Murder | 28 |
| Offense Characteristics: Injury to Arnold Blake | +2 |
| Adjustment for role in the offense: None | 0 |
| Victim related adjustment: | 0 |

| | Level | Units |
|---|---|---|
| Adjustment for obstruction of justice | | 0 |
| Adjusted offense level | | 0 |
| **ADJUSTED OFFENSE LEVEL – GROUPING PROVISIONS** | **Level** | **Units** |
| Group One | 40 | 1 |
| Group Two | 30 | 0 |
| Total Number of Units | | 1 |
| Increase in offense level based on units | | 0 |
| Highest Adjusted Offense Level | | 40 |
| Combined Adjusted Offense Level | | 40 |
| Adjustment for Acceptance of Responsibility | | 0 |
| **TOTAL OFFENSE LEVEL** | | **40** |

See PSR ¶¶46-66.  The PSR also calculated Mr. Burden to be in Criminal History Category III based on 6 criminal history points.  See id. at ¶¶67-72.  The PSR's recommended sentencing range was thus 360 months to life imprisonment.

The thrust of Mr. Burden's objections to the PSR, and the arguments advanced in his sentencing memorandum, were that the PSR overstated Mr. Burden's role in the drug conspiracy (he was merely a "street level dealer"), it improperly considered the violent acts to be in furtherance of Kevin Burden's drug business (the acts were personal in nature), and the Court ought to depart downward based on a number of grounds to reach a sentence that imposed a sentence "sufficient, but not greater than necessary," to comply with the goals of sentencing.  See U.S.C. §3553(a).[1]

---

[1] Mr. Burden incorporates herein all departure arguments advanced in his sentencing memorandum to the extent they were rejected by the Court under a view that they did not conform to the requirements of the mandatory Guidelines and/or case law discussing departures under the Guidelines.

On May 16, 2003, while post-trial motions still were pending, the Court commenced sentencing proceedings in this case. On that date, the Court held a <u>Fatico</u> hearing on the issue of drug quantity. The Government presented one witness, Government cooperator Tony Burden, who testified regarding David "QB" Burden's role in the narcotics conspiracy and the range of quantities involved with his drug dealing. <u>See</u> 5/16/03 Tr. at 56-134.

On September 5, 2003, the Court conducted a continued sentencing hearing, this time addressing the PSR and the hotly contested issue of drug quantity. After resolving and/or ruling on most of the objections to the PSR, the Court adopted the PSR, but reserved on the issue of drug quantity.

On October 8, 2003, the Court concluded oral argument on the drug quantity issue, addressed Mr. Burden's departure arguments, and imposed sentence. In its sentencing ruling, the Court rejected the testimony of Tony Burden with respect to the large quantities allegedly attributable to David "QB" Burden (10/8/03 Tr. at 25-30) and rejected the notion that David "QB" Burden was an "enforcer" for Kelvin Burden's drug business (<u>id.</u> at 44). In fact, the Court rejected nearly all of Tony Burden's testimony, "except to the extent that the Court credit[ed] that [Tony Burden] sold to David L. Burden from time to time, and that David L. Burden was a street dealer." <u>See</u> <u>id.</u> at 30. The Court went on to find that, under the relevant conduct provisions of the Guidelines, David "QB" Burden was responsible for between 50-150 grams of cocaine base. <u>See</u> <u>id</u>. at 50.

As a result of the Court's drug quantity finding, Mr. Burden's Guidelines calculations were amended as follows:

**GROUP ONE: RICO Conspiracy and Drug Conspiracy:**

| | |
|---|---|
| Drug Quantity (50 - 150 grams of cocaine base) | 32 |
| Use of firearm in connection with the offense of conviction | +2 |
| Adjustment for role in the offense | 0 |
| Victim related adjustment: None | 0 |
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level: | <u>34</u> |

**GROUP TWO: VCAR Attempted Murder, VCAR Conspiracy to Murder:**

| | |
|---|---|
| VCAR Attempted Murder | 28 |
| Offense Characteristics: Injury to Arnold Blake | +2 |
| Adjustment for role in the offense: None | 0 |
| Victim related adjustment: | 0 |
| Adjustment for obstruction of justice | 0 |
| Adjusted offense level | <u>30</u> |

| **ADJUSTED OFFENSE LEVEL – GROUPING PROVISIONS** | **Level** | **Units** |
|---|---|---|
| Group One | 34 | 1 |
| Group Two | 30 | 1 |
| Total Number of Units (U.S.S.G. §3D1.4(a)) | | 2 |
| Increase in offense level based on units | | 2 |
| Highest Adjusted Offense Level | | 36 |
| Combined Adjusted Offense Level | | 36 |
| Adjustment for Acceptance of Responsibility | | 0 |
| **TOTAL OFFENSE LEVEL** | | <u>**36**</u> |

As shown above, although Mr. Burden's highest offense level was 34, he was subjected to a two-level increase under U.S.S.G. §3D1.4(a) because Group One and Group Two were separated by only four levels. See also 10/8/03 Tr. at 54. This changed his sentencing range, prior to any departures, from 188-235 months to 235-293 months. With regard to Mr. Burden's criminal history calculation, the Court amended the Criminal History calculation to include five points, but this had no effect on his Criminal History Category designation, CHC III. The above calculations resulted in an applicable Guideline range of 235-293 months.

The Court then considered departure arguments advanced by Mr. Burden, which including arguments based on (i) Mr. Burden's criminal history, (ii) his minor role in the offense, (iii) the failure of the Guidelines to account for the "quantity/time factor" in street level dealing, and (iv) "outside the heartland" considerations under U.S.S.G. §5K2.0. See also U.S.S.G., Ch. 1, Pt. A, §4(b) (policy statement). The Court departed downward on criminal history grounds only, departing one level to Level 36, CHC II, with a sentencing range of 210-262 months. The Court imposed a sentence of 210 months, the minimum sentence within the mandatory range. Id. at 80-82.

Mr. Burden appealed his conviction and sentence. On April 4, 2005, the Court of Appeals ordered a limited remand in Mr. Burden's case in light of the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2005) and the Court of Appeals' recent decision in United States v. Crosby, 397 F.3d 102 (2d Cir. 2005).

On June 21, 2005, the Court issued an Order announcing that, consistent with Crosby, it "intend[ed] to consider whether it would have imposed a non-trivially different sentence in this case if the Sentencing Guidelines had been advisory." The Court

indicated that the review "will include a review of the pre-sentence report and the transcript of the sentencing hearing."

What follows are Mr. Burden's arguments for why he should be resentenced.

## ARGUMENT

## I.     SENTENCING FRAMEWORK AFTER <u>UNITED STATES V. BOOKER</u>

In <u>United States v. Booker</u>, the U.S. Supreme Court held that a sentencing judge's compulsory use of the Guidelines to enhance a sentence beyond the Guidelines range applicable to the facts found by a jury or admitted by a defendant violated the Sixth Amendment. 125 S.Ct. at 756. This constitutional defect required severance of the provisions of the Sentencing Reform Act that made the Guidelines mandatory, namely 18 U.S.C. §3553(b)(1). <u>Id.</u> at 756-57; <u>see</u> <u>Crosby</u>, 397 F.3d at 103. The Guidelines are now to be deemed "advisory" only, such that courts are to "consider" presumptive Guideline ranges, <u>see</u> §3553(a)(4), but are permitted to tailor sentences in light of other statutory concerns. <u>See</u> §3553(a); <u>Booker</u>, 125 S.Ct. at 757-69; <u>Crosby</u>, 397 F.3d at 114.

The Court also excised the provision of the Sentencing Reform Act setting forth appellate standards of review, 18 U.S.C. §3742, holding that sentences should be reviewed under the standard of "reasonableness," determined with reference to the standards set forth in 18 U.S.C. §3553(a). <u>Booker</u>, 125 S.Ct. at 757. Accordingly, post-<u>Booker</u>, the Sentencing Reform Act requires a sentencing court to regard the Guideline ranges as one of many factors to consider in determining the sentence. <u>See</u> <u>id.</u> at 766; <u>see</u> <u>also</u> <u>id.</u> at 790 (Scalia, J., dissenting in part) (noting that "district courts have

discretion to sentence anywhere within the ranges authorized by statute – much as they were generally able to do before the Guidelines came into being.").

The more difficult issue post-<u>Booker</u> is determining what weight the Court should give to the advisory Guideline range.  We submit that the Guideline range (inclusive of departures) should be faithfully "considered," <u>Crosby</u>, 397 F.3d at 113, but given no more weight than any of the other factors set forth in 18 U.S.C. §3553(a).  The Supreme Court neither held, nor implied, that the measure of "reasonableness" is the Guideline sentencing range.  Such a system, whereby, for example, the advisory Guideline range is the presumptive sentence absent "extraordinary circumstances," comes perilously close to the mandatory regime found unconstitutional in <u>Booker</u>.  <u>See Crosby</u>, 397 F.3d at 115; <u>United States v. Jaber</u>, 362 F. Supp.2d 365 (2005); <u>see also Booker</u>, 125 S.Ct. at 794 (Scalia, J., dissenting) ("any system which [holds] it per se unreasonable (and hence reversible) for a sentencing judge to reject the Guidelines is indistinguishable from the mandatory system" that the Supreme Court found unconstitutional).

The Court's determination of reasonableness in the first instance, then, should be guided by all of the statutory factors set out in Section 3553(a), which are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines … ;

(5) any pertinent policy statement issued by the Sentencing Commission … ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

See 18 U.S.C. §3553(a).

After considering the above factors, Booker permits the Court to impose a sentence within the applicable guideline range (inclusive of departures), or a non-Guideline sentence outside of the range if such is justified by the statutory factors set forth in 18 U.S.C. §3553(a).  Moreover, a non-Guideline sentence need not be supported by factors that would have justified a departure under the old, mandatory regime, and the court need not definitively resolve any departure issues if it has decided to impose a non-Guideline sentence.  See Crosby, 397 F.3d at 112.

## II.    THERE ARE COMPELLING REASONS TO RESENTENCE IN THIS CASE

Only the Court knows whether, under the sentencing regime announced by Booker, it would have sentenced Mr. Burden to a sentence *less than* 210 months. What is clear is that any claim by the Government in these proceedings that the Court's sentence of 210 months is "presumptively reasonable" and should stand absent "extraordinary circumstances" would run afoul of Booker.  As discussed in Crosby, "such *per se* rules would risk being invalidated as contrary to the Supreme Court's

holding in Booker/Fanfan, because they would effectively re-institute mandatory adherence to the Guidelines." 397 F.3d at 115 (citing Booker, 125 S.Ct. at 794 (Scalia, J., dissenting in part)).

In these proceedings, the inquiry should be squarely on (i) whether the Court felt constrained by the Guidelines in imposing its original sentence, and (ii) whether there were considerations and arguments available to counsel that would have been relevant under the sentencing statute, 18 U.S.C. §3553(a), but were not presented or considered at the time by the Court because they either were prohibited considerations under the Guidelines, or they did not conform to the requirements of the Guidelines as interpreted by the Sentencing Commission and then-existing case law. If these considerations would have impacted the Court's sentencing decision in a material way, then resentencing is appropriate.

As set forth below, Mr. Burden submits that there are compelling reasons to resentence in his case. It is at least possible that the Court may have felt constrained by the Guidelines in issuing its 210 month sentence; and further, the more flexible sentencing analysis compelled by Section 3553(a) suggests that Mr. Burden's original Guideline sentence was "greater than necessary" to serve the purposes of sentencing.

**A.    Advisory Guideline Range**

Since federal sentencing now involves two analytic stages – a determination of the applicable Guidelines range (including any departures), and a determination of whether a non-Guidelines sentence is appropriate in light of the other factors listed in Section 3553(a) – we address first whether the Guideline range applicable to Mr. Burden was appropriate.

Even after departing one level based on Mr. Burden's criminal history, the sentence called for by the Guidelines was a lengthy 210-262 months. This sentencing range was driven largely by the weight of the drugs attributable to Mr. Burden, which the Court found to be between 50-150 grams of cocaine base. However, because Mr. Burden was involved with cocaine base, as opposed to powder cocaine, his sentence was greatly enhanced under the drug conspiracy provisions of the Guidelines.

For the reasons discussed comprehensively and at length in United States v. Smith, 359 F.Supp.2d 771 (W.D. Wis.2005), Mr. Burden submits that the Court would be entitled at resentencing to rely on the crack/cocaine ratio disparity as a reason to alter the drug quantity finding further and/or issue a non-Guidelines sentence. See id. at 777-82 (W.D. Wis.2005) (concluding that adherence to Guidelines would result in a sentence greater than necessary and would also create unwarranted disparity between defendants convicted of possessing powder cocaine and defendants convicted of possessing cocaine, and imposing non-Guidelines sentence); see also Simon v. United States, 361 F.Supp.2d 35, 44 (E.D.N.Y. 2005) (observing that, "[s]ince Booker, a number of courts have accepted the argument that in cases involving crack, they should consider non-Guidelines sentences"); United States v. Carvajal, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005) (imposing sentence below Guidelines in case involving defendant convicted of crack cocaine offense); United States v. Nellum, 2005 WL 300073, *3 (N.D. Ind. Feb. 3, 2005) (same).

Even a slightly lower drug quantity finding in this case would have had a dramatic impact on Mr. Burden's sentencing calculations and the applicable range. Consider the following example. If Mr. Burden's offense level under the drug table had been 30,

instead of 34, then his Total Offense Level would have been 34 instead of 36. Taking into account the Court's one-level departure based on criminal history, Mr. Burden's sentence would have been 168-210 months. A sentence at the low end of this range, 168 months, would be 42 months lower than Mr. Burden's current sentence. We submit that a difference of 42 months is not a trivial difference, but rather amounts to another three-and-a-half years that Mr. Burden would be able to spend with his family and daughter.

**B.     Section 3553(a)(1): Nature and Circumstances of the Offense**

Section 3553(a) also requires the Court to consider the nature and circumstances of the offenses of conviction. In Mr. Burden's case, this requires consideration of the underlying conduct that led to Mr. Burden's conviction for RICO, RICO Conspiracy, Narcotics Conspiracy, VCAR Attempted Murder, and VCAR Conspiracy to Murder.

To be sure, the crimes of which Mr. Burden stands convicted are serious offenses. But Mr. Burden's involvement in these crimes, albeit regrettable, can be explained. For the reasons discussed at length in Mr. Burden's post-trial motions, in his sentencing memorandum, and by counsel during the sentencing hearings in this matter, Mr. Burden's level of involvement and the reasons behind his involvement can be summarized briefly as follows:

- "[He] was a young family member (17-19 years old) who came under the influence of his older cousins." See PSR ¶113.

- He was a minor participant, a mere "street level dealer" dealing in small quantities of crack to make money on his own. Mr. Burden was not the "big-time" drug dealer that Congress envisioned when it promulgated the harsh drug sentencing guidelines. He did not "'live in the fast lane . . . drive big cars – usually several – like BMWs and

Mercedeses;" nor did he wear "[b]ig gold chains and big gold [and] diamond rings.'" <u>United States v. Genao</u>, 831 F. Supp. at 247 (quoting 134 Cong.Rec. S3127 (1988) (remarks of Senator Graham)).

- His participation in the violent acts that formed the basis of the RICO and VCAR convictions was not directed indiscriminately at innocent bystanders or intended to facilitate his drug dealing; rather it was brief and linked exclusively to his desire to protect his family and himself from attacks by Rodrick Richardson, Fred Hatton, and Terra Nivens. "Mr. [Burden] lived in a 'kill or be killed' jungle of drug dealing. His victims or intended victims were … rival gangs who were attempting to kill him. He was prepared to defend himself and shoot back. He did not . . . attack strangers in the community, or prey on innocent victims." <u>United States v. Ayala</u>, 75 F. Supp.2d 126, 138-39 (S.D.N.Y. 1999)(departing on other grounds to a sentence of 151 months).

Under these circumstances, including Mr. Burden's relatively minor role in the narcotics trafficking, the Court would be justified in issuing a sentence less than what would be imposed on a major drug dealer or an enforcer for a drug gang engaged in indiscriminate violence.

## C.    Section 3553(a)(1): History and Characteristics of the Defendant

Under the old Guidelines regime, important personal characteristics such as the defendant's age, educational and vocational skills, mental and emotional conditions, physical condition, employment record, and family ties and responsibilities were not ordinarily relevant and could only be relied upon to justify a lesser sentence in "exceptional cases." <u>See</u> U.S.S.G. §5H1.1. After <u>Booker</u>, however, these are exactly the sort of characteristics that a sentencing court is likely to find relevant in determining "the history and characteristics of the defendant" as required by Section 3553(a)(1).

Here, the most significant factors to be considered by the Court are Mr. Burden's young age and his role as a father to his young daughter, Jade. As noted above, Mr.

Burden was only 17 years old in 1999 when he first came under the influence of his older cousins. Prior to that time, Mr. Burden showed great promise. As a boy, Mr. Burden, who is known as "Quinten" to many of his friends and family, excelled in school and in sports. He grew up in a religious home, and attended church regularly. PSR ¶80. He was an usher and even sang in the church choir until he was thirteen. He attended West Rocks Middle School in Norwalk and was on the honor roll. It was around this time that he began to participate in amateur boxing matches. His trainer was John Harris, a church deacon and close friend of the family. He excelled in this activity and seemed to find his focus. He was involved in many local matches at the former Ben Franklin gymnasium near Meadow Gardens in South Norwalk, and he passed out flyers to help promote the events.

He attended 9th and 10th grades at Norwalk High School. See PSR ¶89. He played other sports, including basketball, and his boxing career flourished during this time. At the age of fifteen or sixteen, he participated in a national amateur boxing tournament, the winners of which are frequently asked to join the Junior Olympic boxing team. He was chosen as the Connecticut representative after he won the lightweight title in the state finals in Hartford. After moving on and winning the regional finals in Rhode Island, he was selected as the New England representative at the East Coast Finals in Lake Placid, New York. He won his class title at Lake Placid, but was unable to go on to the nationals and compete for the Junior Olympic team because he was under the age of seventeen.

As he began to hang out more with his older cousins, however, Mr. Burden's life changed course. Whereas he began his high school career attending Stanine 8 classes

(for above-average students), he soon began to receive below-average grades and was eventually given a choice to repeat tenth grade or to enroll in Briggs High School for Vocational Studies.  He enrolled at Briggs High School from 1996 to 1999, but did not complete the required amount of credits for graduation.  (On February 28, 2003, while incarcerated at New Haven Correctional Center, Mr. Burden successfully passed the General Education Equivalency Test.)  While at Briggs High School, he stopped playing sports, picked up bad habits, and stopped "following the rules" of his mother's house. He started smoking, drinking, and partying with his older cousins.  See PSR ¶¶ 79, 86. Indeed, it appears that Mr. Burden's participation in the violence with the Hill Crew in the fall of 1999 likely occurred after nights of "drinking" and "partying" with his older cousins.

Mr. Burden's criminal history also surfaced around the time he began hanging out with his older cousins.  But none of his state convictions resulted in jail time, and all were consistent with the poor behavior he observed hanging out with Kelvin Burden, David DMX Burden, Tony Burden, Jermain Buchanan, and others.

Despite his youthful indiscretions and immature behavior, Mr. Burden was an active presence in the life of his baby daughter, Jade.  During the sentencing hearing on September 5, 2003, Jade's mother, Kaysie Campbell, described what kind of father Mr. Burden had been prior to his arrest and how important it would be to have him involved in their daughter's life:

> MS CAMPBELL:  I'm here today, like Attorney Frost said, to speak about my relationship with David Burden, and I will reference him as Quentin [or] Q instead of David…. Quentin and I were together for close to four years and, like many relationships, you have ups and downs. Sometimes I initiated physical activity against him and, as Attorney Frost said, the government noted that we did have a domestic issue stemmed from my anger and I initiated physical activity against Quentin, he made an effort to restrain me, did not hit me, which I was under the impression

the government made it seem that way. I'm not clear because I have not been in every hearing.

Also, with his sentencing, I'm hoping that you keep in mind that he does have a three-year-old daughter and Quentin is not – I don't want to say that Quentin is wrongfully imprisoned but I would not be happy, I know that my daughter would suffer, if her were imprisoned for an amount of time when my daughter will grow up and she would basically be on her own by the time he comes home.

And during the time that Quentin was home, he was actually taken away from us on June 12th, 2001, which was four days before her first birthday and June 11th, we were out shopping for her first birthday party and Quentin did pay for everything, he wanted to make sure that his daughter had a wonderful party and unfortunately, he was not there but at the same time, when he was home, he did make an effort to be involved in her life.

While I was working and completing my senior of high school, he would spend some days with the baby, sometimes Jade would go to the babysitter, sometimes she would just be with Quentin but the path that I began to see him follow was bothering me and I didn't want out daughter subject to that type of environment. I didn't know exactly what was going on and I was not under the impression that Quentin was as heavily involved as I have during these hearings.

But basically, right before I left to go to college, which was August 2001, that June, was basically when everything came to a complete end because that's when he was taken away from us.

Jade, I do take Jade to see Quentin as often as I can and she does reference him as her dad, but at the same time, he's not there physically and when she see[s] other children at her school interacting with their parents and their dad, you know, it's hard to explain to her….. And it's hard when she says, mommy, daddy's going back home? Like after the visit's over? That's not daddy's home, but that's all she knows because that's where the government said he has to be and I just want her to have the opportunity to have a good relationship with Quentin at a good stage in life.

He's already missed her first, second, third birthday. He's missing school. He's missing her progress. She's a very smart girl. I have to go to teacher conferences by myself and basically I'm the one left to do everything because Quentin's not here, physically, you know.

He writes letters and he sends her cards and everything.  He's very much involved with her although he's away and, I mean, I just hope that me speaking to you and the character letter and you seeing Jade and you know that he was involved in Jade's life prior to being in prison, and during his time served he's been involved with her, that you will consider the good side of Quentin rather than the bad side that's been addressed in court.

9/5/03 Tr. at 23-26.

Separated from his cousins – as he will be for some time as a result of this case – and with added maturity, it is highly unlikely that Mr. Burden would again engage in the conduct that separated him from his family and brought hi before this Court.  Indeed, his conduct while in custody, both before and after his sentencing, bears this out.  Despite the Government's claim that Mr. Burden is an inherently violent and dangerous person, Mr. Burden has not been involved in any physical altercations with guards or other inmates from the time of his arrest in June 2001 through to the present.  He has become OSHA certified and handles recycling duties at the prison and has recently signed up for real estate broker classes.  Perhaps most impressive of all, he graduated from the rigorous, year-long "CODE" program and now counsels inmates once a month to discuss anger management, stress management, and dealing with prison life.  Not surprisingly, he is the one of the youngest graduates of the program and one of the youngest inmates in the whole facility.

Mr. Burden submits that the Court ought to give great weight to his age and immaturity at the time he committed the offenses of conviction and should recognize, as the Court probably does, that his actions were purely a product of his environment.  It does not excuse the conduct, but it provides some basis for concluding that a lengthy prison sentence would be an unduly harsh consequence for youthful mistakes.  In

recognition of his youth, and the need for his daughter, Jade, to know her father growing up, we urge the Court to consider a non-Guidelines sentence.

**D.    Section 3553(a)(2):  Purposes of Punishment**

Section 3553(a)(2) instructs the Court to craft a sentence that reflects the seriousness of the offense (just punishment) and promotes respect for the law (deterrence), while at the same time recognizing the value and likelihood of rehabilitation.  Here, a sentence less than 210 months would be "sufficient but not greater than necessary" to meet these goals.

One can always argue that a long sentence serves the purpose of deterring criminal conduct generally.  Moderating this to some extent, however, is the need to determine whether such a long sentence is actually necessary to deter a particular defendant and thereby protect the public from future crimes.  Mr. Burden is currently 25 years old.  He will be approximately 37-38 years old when released under his current sentence of 210 months (taking into account good time and time served).  At that time, he will be middle-aged, with no family of his own, and his daughter will have grown up without him.  Although the reality of such a future does not doom his rehabilitation, it is undoubtedly true that "[rehabilitation] cannot be served if a defendant can look forward to nothing beyond imprisonment."  Carjaval, 2005 WL 476125 (imposing non-Guideline sentence upon defendant convicted of conspiring to distribute crack).  It is doubtful whether a sentence of 210 months for this defendant, based on his young age, provides such hope.  On the other hand, if Mr. Burden is released sooner, under a lesser non-Guidelines sentence, he would have brighter prospects for rehabilitation and he would be a presence in his young daughter's life.

At least one post-<u>Booker</u> sentencing court has noted that recidivism drops substantially with age.  <u>See</u> <u>Nellum</u>, 2005 WL 300073 (granting non-Guideline sentence and noting that recidivism rate for defendants between the age of 41 and 50 with a criminal history category of III is less than half that of defendants under the age of 21).  Mr. Burden submits that the Guidelines' failure to adequately account for this phenomenon renders it an imperfect measure of how long a particular defendant's sentence should be in order to deter future crime and protect the public.  Mr. Burden has matured since the time he committed these crimes under the influence of his older cousins, and he has matured during his time served to date.  It would be unduly punitive to incarcerate him for 210 months to deter him from engaging in criminal activity upon release.  Accordingly, we urge the Court to consider a non-Guidelines sentence that would allow him to be released in his early thirties, with the hope that he can rebuild his life, be an example to others, and be a presence in his young daughter's life.

**CONCLUSION**

For the foregoing reasons, Mr. Burden requests that the Court schedule a new

sentencing hearing and impose a sentence less than 210 months.


Respectfully submitted,


_____
Robert M. Frost, Jr. (ct 19771)

ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Blvd.
P.O. Box 1740
Bridgeport, Connecticut 06604
Telephone: (203) 333-9441
Facsimile:  (203) 333-1489
Email: rfrost@znclaw.com

Attorneys for David L. Burden
a/k/a Q a/k/a QB a/ka Quinten

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been sent via facsimile and U.S.

Mail, postage prepaid, to:

Stephen B. Reynolds, Esq.
United States Attorney's Office
915 Lafayette Boulevard
Bridgeport, CT  06604

And via U.S. Mail, postage prepaid to:

Jacqueline Carroll
United States Probation Officer
U.S. Probation Office
915 Lafayette Boulevard
Bridgeport, CT 06604

Jeremiah Donovan, Esq.
P.O. Box 554
Old Saybrook, CT  06475

Timothy Aspinwall, Esq.
3200 Main Street
Stratford, CT  06497

William T. Koch, Esq.
151 Brush Hill Road
Lyme, CT  06731
860-434-3060


Dated at Bridgeport, Connecticut this 4th day of August 2005.


_____
Robert M. Frost, Jr.